## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, RODNEY STAHL,<br><br>Relator,<br><br>vs.<br><br>POSTAL FLEET SERVICES, INC.,<br><br>Respondent. | CASE NO. 1:19-CV-01900<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br><br>**MEMORANDUM OPINION AND ORDER** |

Before the Court is the Respondent Postal Fleet Services, Inc.'s ("Respondent" or "Postal Fleet") Motion to Dismiss.  (ECF Docs. 55, 55-1 "Motion").)  The Motion is fully briefed and ripe for decision.  (ECF Docs. 56, 57, 58.)   In his opposition brief, Relator Rodney Stahl ("Mr. Stahl" or "Relator") requests leave to amend if the Court is inclined to grant Respondent's Motion. (ECF Doc. 57, p. 21.)  The parties have consented to the magistrate judge pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  (ECF Doc. 40).  For the reasons set for the below, the Court **GRANTS** Respondent's Motion and **DENIES** Relator's request for leave to amend.

### I.        Background

**A.        Procedural Background**

This qui tam action was filed on August 21, 2019, by Mr. Stahl as Relator for the United States against Respondent Postal Fleet, asserting claims under the False Claims Act, 31 U.S.C. § 3729.  (ECF Doc. 1.)  Scott Pryor ("Mr. Pryor") was also identified in the Complaint as a Relator.  (*Id.* at p. 3, ¶ 6.)  Mr. Stahl subsequently filed an amended complaint on January 9,

1

2023.[1]  (ECF Doc. 51 ("Am. Compl.").)  As summarized below, multiple procedural filings and rulings preceded the filing of the Amended Complaint in this case.

On July 16, 2021, the United States declined to intervene in these proceedings pursuant to 31 U.S.C. § 3730(b)(4)(B).  (ECF Doc. 10.)  The Complaint was thereafter unsealed on July 21, 2021, and the Court ordered service upon the Respondent.  (ECF Doc. 11.)  Respondent was served on October 12, 2021.  (ECF Doc. 14.)

Relator filed an application for entry of default on December 21, 2021, based on Respondent failing to move or plead as required by the Federal Rules of Civil Procedure.  (ECF Doc. 17.)  Default was entered on December 22, 2021.  (ECF Doc. 18.)  Relator then filed a motion for default judgment on March 4, 2022, later amended on March 9, 2022.  (EFC Docs. 26 & 27.)  Respondent opposed the amended motion for default on April 21, 2022. (EFC Doc. 32.)  As stipulated by the parties, the entry of default was set aside and vacated and the motions for default were withdrawn on October 12, 2022.  (ECF Doc. 46; October 12, 2022 non-document entry.)  Pursuant to that same stipulation, on November 18, 2022, Respondent produced to Relator "a batch production of documents previously produced to the Government in response to the Government's Civil Investigative Demand in connection with this matter[,]" which "[t]o Respondent's and counsel's knowledge and belief . . . contain[ed] all documents produced to the Government in response to that Civil Investigative Demand." (ECF Doc. 49).

Respondent filed a motion to dismiss the Complaint on December 19, 2022.  (ECF Doc. 50.)  In response, Relator filed his Amended Complaint on January 9, 2023 (ECF Doc. 51), mooting the December 2022 motion to dismiss (ECF Doc. 53, 54).  As stipulated by the parties, a briefing schedule was set for Respondent's anticipated motion to dismiss Relator's Amended Complaint.  (ECF Doc. 54.)

---

[1] Mr. Pryor is not a named a Relator in the Amended Complaint.

On February 8, 2023, Respondent filed the pending Motion, seeking dismissal of Relator's Amended Complaint.  (EFC Doc. 55.)  On March 7, 2023, the United States filed a statement of interest to address a matter of law raised in Respondent's Motion.[2]  (ECF Doc. 56.) Relator filed his opposition brief on March 10, 2023 (ECF Doc. 57) and Respondent filed its reply brief on March 31, 2023 (ECF Doc. 58).

**B.    Relevant Factual Allegations**

**1.    Relationship Between Postal Fleet and the United States**

Respondent Postal Fleet is a Florida Corporation that operated as a United States Postal Service ("USPS") ground service contractor in 35 states across the nation, including Ohio.[3] (Am. Compl., p. 2, ¶ 4.)  Postal Fleet operated in that capacity under the McNamara-O'Hare Service Contract Act ("SCA"), 41 U.S.C. § 6701, *et. seq.*,[4] which governs contracts between federal agencies and private entities who furnish services using "service employees."  (*Id*. at p. 3, ¶¶ 12-14.)  Respondent received over $100 million per year in contracts from the USPS as a private contractor for USPS (*id*. at p. 3, ¶ 14) and, during the relevant timeframe, received at least $2,400,000 for performance of its service contracts with the USPS to provide ground transportation services.  (*Id*. at p. 2, ¶ 9.)

**2.    Relationship Between Postal Fleet, Mr. Stahl, and Mr. Pryor**

Mr. Stahl was employed by Postal Fleet as a tractor-trailer driver from USPS's Cleveland Processing & Distribution Center from September 22, 2017, through August 29, 2019.

---

[2] The United States argues in its statement of interest that the Supreme Court did not "fashion[] a mandatory two-part test to determine whether a claim is false under an implied false certification theory" in *Universal Health Services, Inc. v. United States et al. ex rel. Escobar*, 579 U.S. 176 (2016).  (ECF Doc. 56, p. 2.)

[3] Respondent states that it effectively ceased operations in 2021 for reasons unrelated to this litigation.  (ECF Doc. 55-1, p. 7, n. 1.)

[4] The SCA was codified as 41 U.S.C. § 351, *et seq.* prior to 2011.  Relator cites to the prior versions (ECF Doc. 51, p. 3, ¶ 12; ECF Doc. 57, p. 3) and Respondent cites to the current versions (ECF Doc. 55-1, p. 10).  The Court cites to the current versions.

(Am. Compl., p. 2, ¶ 5.)  Mr. Pryor was employed by Postal Fleet as a tractor-trailer driver from

USPS's Cleveland Processing & Distribution Center from August 1, 2018, through June 30,

2019.  (*Id*. at p. 6, ¶ 32.)  The SCA defines service employees as those performing the services on

a covered contract, other than bona fide "executive," "administrative," or "professional"

employees as those terms are defined in the FLSA and the Department of Labor's implementing

regulations.  (*Id*. at p. 3, ¶ 16.)  Relator and other Postal Fleet employees were working for Postal

Fleet as "service employees" under the SCA.  (*Id*. at p. 5, ¶ 18.)

      **3.**      **Service Contract Act**

      The SCA requires federal government contractors like Postal Fleet to pay "service

employees" no less than the wage rates and fringe benefits prevailing in the locality or, if

applicable, the rates in a predecessor contractor's collective bargaining agreement.  (Am.

Compl., p. 3, ¶ 15.)  A private contractor violates the SCA if they fail to make timely payments

of the minimum wages or fringe benefits set forth in wage determinations.  (*Id*. at p. 4, ¶ 20.)

      Contractors bid for SCA-governed service contracts by including the anticipated costs of

performing those contracts.  (*Id*. at p. 4, ¶ 19.)  Those costs include the SCA-mandated prevailing

wage rate determinations that are issued by the Department of Labor for inclusion into SCA

covered contracts.  (*Id* at p. 4, ¶ 18-19.)  Federal contracting agencies, like the USPS, use

contractors' bids and the anticipated costs incorporated therein when selecting contractors.  (*Id*.

at p. 4, ¶ 19.)  SCA wage determinations are included in the contract between the federal

contracting agency and the private contractor, such as the USPS.  (*Id*. at p. 4, ¶ 20.)  When

renewing an SCA-governed service contract, private contractors, like Postal Fleet, "must certify

that they will compensate their service employees under the prevailing wage rates set forth in the

then-existing governing wage determinations."  (*Id*. at p. 4, ¶ 21.)

4.      **Respondent's Alleged Service Contract Act Violations**

Respondent provided contracted postal work in Northern Ohio under USPS Contracts HCR440N9, HCR280N6, and HRC275P0.  (Am. Compl., p. 5, ¶ 27.)   The minimum wage and fringe rates for each contract were set forth in Department of Labor Wage Determinations.  (*Id* at p. 5, ¶ 29.)  The minimum wage for contract HCR440N9, as set forth in Department of Labor Wage Determination 1977-0195, was $20.70 as of February 2019; the required fringe benefit rate was $5.06 per hour for up to 40 hours in a workweek.  (*Id* at pp. 5, 7-8 ¶¶ 29, 34, 38.)  The fringe benefit amount for contracts HCR280N6 and HRC275P0, as set forth in Department of Labor Wage Determination 1977-0193, was $4.70 per hour for up to 40 hours in a workweek as of February 2019.[5]  (*Id*. at pp. 5, 8, ¶¶ 29, 38.)

Relator generally alleges that Respondent failed to "compensate its service employees in accordance with these rates and, therefore, fail[ed] to compensate its service employees in accordance with the SCA," and further asserts that Postal Fleet "utilizes a variety of illegal tactics to underpay its employees, retaining funds received under the contract and which [Postal Fleet] represented in its bid to the USPS would be necessary to perform the contracted services." (Am. Compl., p. 6, ¶ 30; *id* at p. 7, ¶ 36.)   Relator also asserts that Postal Fleet "frequently fail[ed] to compensate its service employees for all hours worked," alleging that, "[o]ften, hours spent by employees traveling mid-workday between Post Offices and/or Processing and Distribution Centers [were] unpaid[] [and] [o]ther times, Respondent fail[ed] to compensate its employees for time spent loading and unloading mail trucks."  (*Id*. at p. 6, ¶ 31.)

Relator provides two examples to illustrate these alleged violations, pointing to time and pay records for Mr. Stahl and Mr. Pryor from February 2019.  (Am. Compl., pp. 6-9, ¶¶ 32-35,

---

[5] Relator alleges that Department of Labor Wage Determination 1977-0193 also sets forth the minimum wage amount for contracts HCR280N6 and HRC275P0 (ECF Doc. 51, p. 5, ¶29), but no minimum wage amounts as to that Wage Determination are alleged in the Amended Complaint.

37-42.) Relator alleges that Mr. Stahl performed work for Postal Fleet under each of the three identified contracts (HCR440N9, HCR280N6, and HRC275P0) (*id*. at p. 5, ¶ 28) and Mr. Pryor performed work for Postal Fleet under contract HCR440N9 (*id.* at p. 7, ¶ 34). As an example of the failure to pay the required minimum wage amount, Relator points to Mr. Pryor's time and pay records from February 2019, alleging Mr. Pryor was "shorted $164.15 of earned hourly wages" for the pay period of February 16-28, 2019. (*Id*. at pp. 6-7, ¶¶ 33-35.) As an example of the failure to pay the required fringe benefit amount, Relator points to his own time and pay records from February 2019, alleging he was entitled to $872.95 in fringe benefits in February 2019, but Postal Fleet contributed only $736.07. (*Id*. at pp. 7-9, ¶¶ 36-41.) Relator also alleges that "at various times," he and Mr. Pryor were "subjected to" the described practices (*id*. at p. 9, ¶ 42), and that, "[u]pon information and belief," Postal Fleet "subjected employees throughout the country to the same practices as Relator Stahl and Scott Pryor in order to win federal contracts and illegally retain money that belonged to its employees" (*id.* at p. 9, ¶43).

     **5.    Respondent's Alleged Knowledge of SCA Violations**

Relator alleges that Postal Fleet payroll administrators knew of the SCA underpayment issues because, at an unspecified date, Relator and unnamed coworkers reported "concerns of [SCA] underpayment" issues to Tina Farmer, an employee in Postal Fleet's payroll department, but the issues were not resolved. (Am. Compl., p. 9, ¶ 44.) He asserts that Ms. Farmer's "knowledge may be imputed to the organization" (*id.*) and further alleges "upon information and belief" that "Ms. Farmer's supervisors – i.e., Respondent's officers and executives – knew of rampant SCA underpayments throughout the country and failed to rectify the practices resulting in those underpayments" (*id*. at p. 9, ¶ 45). As an example, Relator asserts that "in April 2019, Postal Fleet Services paid $329,057 in back wages and benefits to 53 Alabama- and Mississippi-

based employees for SCA violations functionally identical to those alleged" in the Amended

Complaint.  (*Id*. at p. 9, ¶ 46.)

### 6.    Respondent's Alleged False Certifications

Relator alleges that Postal Fleet submitted USPS Form 7445 when it renewed its SCA-

governed service contracts and "falsely certified to the USPS it would 'pay all service employees

no less than the minimum salary and fringe benefits equal to the amount shown on the attached

Wage Determination.'"  (Am. Compl., p. 4, ¶ 22.)  Relator also alleges that "clauses in the

Statement of Work set forth the applicable wage rate" and PS Form 7345B, a form that was

"incorporated into the contracts at issue in this case, tells contractors that '[b]y executing the

contract, the Supplier [e.g., Respondent] agrees to perform the Statement of Work, and accepts

the clauses and provisions stated'" therein.  (*Id*. at pp. 4-5, ¶ 23 (brackets in original).)  Relator

asserts that Postal Fleet's "certification" and its "promise to pay prevailing wages and fringe

benefits, [were] a requisite part of contracting process" (*id*. at p. 4, ¶ 23) and that Postal Fleet's

"officers and executives executed and submitted at least a dozen such certifications to the USPS

yearly" (*id*. at p. 5, ¶ 22.)  Relator also asserts that USPS required Respondent to submit "payroll

journals or check stubs" within ninety days of "any mid-contract change in the prevailing wage

rate" to show it had "complied with the SCA's requirement that covered service employees

[were] paid at least the minimum salary and fringe benefits for hours worked."  (*Id*. at p. 5, ¶ 24.)

Relator therefore alleges that Postal Fleet "submitted, and continues to submit, such

certifications as the USPS Form 7445 and payroll journals to the USPS knowing at the time of

submission that it has not paid its SCA-covered employees as required by the SCA, and further

has no intent to pay its service employees under its certifications."  (Am. Compl., p. 5, ¶ 25.)

Relator further alleges that Postal Fleet "does so to secure and maintain SCA-governed contracts

for which it otherwise would be ineligible due to [its] failure to pay prevailing wage and fringe benefits" because "USPS would not award Respondent SCA contracts without such certifications."  (*Id*. at p. 5, ¶ 26.)

## C.    False Claims Act Claims Alleged in Amended Complaint

Relator's Amended Complaint asserts that Postal Fleet violated the False Claims Act by: (1) knowingly presenting or causing to be presented false or fraudulent claims for payment or approval  in violation of  31 U.S.C. § 3729(a)(1)(A) (Count I) (Am. Compl., p. 10, ¶¶ 49-54); (2) knowingly making, using, or causing to be made or used false records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B) (Count II) (*id*. at p. 11, ¶¶ 55-60); (3) conspiring to commit the aforementioned violations, in violation of 31 U.S.C. § 3729(a)(1)(C) (Counts I & II) (*id.* at pp. 10-11, ¶¶ 49-60); and (4) possessing money used or to be used by the government and knowingly delivering less than all of that money 31 U.S.C. § 3729(a)(1)(D) (Count III) (*id*. at p. 11, ¶¶ 61-63).

In support of these FCA claims, Relator alleges that: Postal Fleet "knowingly, or at least recklessly, violated its certifications that it would pay prevailing wage and fringe benefits to employees" and "knew or should have known that its recordkeeping and pay practices constituted conduct that violated the SCA and [] rendered false its separate certifications to USPS to pay prevailing wage and fringe benefits."  (Am. Compl., p. 9, ¶ 47.)  He alleges that Postal Fleet's "certifications were material to the Government's decision to award [it] contracts and to pay on those contracts as false certifications have the natural tendency to influence the Government's decision to award and renew contracts to [Postal Fleet] and to pay [Postal Fleet] under those contracts."  (*Id.* at p. 10, ¶ 48.)  Finally, he alleges that Postal Fleet's "agreement to

pay the mandated prevailing wages and fringe benefits were a condition precedent to being awarded the contracts at issue in this case."  (*Id*.)

**D.     Motion to Dismiss**

      **1.     Respondent's Arguments in Support of Motion**

Respondent contends that the Amended Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b), asserting four primary arguments.  (ECF Doc. 55.)

First, Respondent argues that Relator's FCA claims under 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B) in Counts I and II, which were premised on presentment of false claims or statements, should be dismissed because Relator: (1) has not alleged that Postal Fleet made an affirmative false statement (ECF Doc. 55-1, p. 12); (2) has not plausibly alleged his claims under an implied certification theory (*id.* at pp. 12-18; ECF Doc. 58, pp. 7-12); and (3) has not plausibly alleged his claims under a fraudulent inducement theory (ECF Doc. 55-1, pp. 18-20; ECF Doc. 58, pp. 12-13).

Second, Respondent argues that Relator's FCA conspiracy claim under 31 U.S.C. § 3729(a)(1)(C) in Counts I and II should be dismissed because Relator: (1) has failed to establish the predicate claims under 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B) (ECF Doc. 55-1, pp. 20-21); and (2) does not plausibly allege facts from which a conspiracy can be inferred (*id* at p. 21; ECF Doc. 58, pp. 14-15).

Third, Respondent argues that Relator's FCA conversion claim under 31 U.S.C. § 3729(a)(1)(D) in Count III should be dismissed because Relator has failed to allege facts that suggest Postal Fleet held property or money belonging to the government or knowingly failed to return money or property to the government.  (ECF Doc. 55-1, p. 21; ECF Doc. 58, pp. 13-14.)

Finally, assuming *arguendo* that Relator has plausibly alleged FCA claim, Respondent argues that Relator's Amended Complaint is subject to dismissal because any such claim is precluded by the public disclosure bar.  (ECF Doc. 55-1, pp. 22-23; ECF Doc. 58, pp. 15-19.)

### 2. Relator's Arguments in Opposition to Motion

In response, Relator argues that he has plausibly alleged actionable FCA claims under an implied certification theory (ECF Doc. 57, pp. 8-15) or a fraudulent inducement theory (*id.* at pp. 15-16), and that he has plausibly alleged falsity, scienter, materiality, and causation (*id* at pp. 8-16).  He also argues that he has plausibly alleged actionable FCA conversion and conspiracy claims.  (*Id.* at pp. 16-17.)  Finally, he argues the public disclosure bar does not apply.  (*Id.* at pp. 17-21.)  Thus, he requests that the Court deny Respondent's Motion to Dismiss.

### 3. Relator's Contingent Request for Leave to Amend

In his response to the Motion to Dismiss, Relator seeks leave to file a second amended complaint *if* "the Court is inclined to grant Respondent's motion on the basis that more examples of widespread pay practices are necessary."  (ECF Doc. 57, p. 21.)  Respondent opposes Relator's request for leave to amend, asserting: (1) it is procedurally flawed; and (2) allowing amendment would be futile and prejudice Respondent.  (ECF Doc. 58, pp. 19-22.)

## II. Motion to Dismiss Standard of Review

Under Rule 12(b)(6), the Court may dismiss a clam when a party fails to plead facts on which relief can be granted.  *See* Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The plaintiff is

not required to include "detailed factual allegations," but must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Iqbal*, 556 U.S. at 678 (citation omitted).

This Court "must construe the complaint in the light most favorable to the plaintiff and accept all allegations as true."  *Doe v. Miami Univ.*, 882 F.3d 579, 588 (6th Cir. 2018) (citation omitted).  However, while "we must accept all well-pleaded factual allegations in the complaint as true, we need not 'accept as true a legal conclusion couched as a factual allegation.'"  *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555, quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

### III.    Discussion

**A.    False Claims Act**

**1.    False Claims Act's Purpose**

The FCA's focus is "on those who present or directly induce submission of false or fraudulent claims" and liability under the Act is essentially punitive in nature.  *Universal Health Services, Inc. v. U.S. ex rel. Julio Escobar*, 579 U.S. 176, 182 (2016); *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 876 (6th Cir. 2006) (The FCA "makes illegal the submission of false or fraudulent claims to the federal government.")  "[S]ignificant penalties" may be imposed under the FCA "on those who defraud the Government."  *Escobar*, 579 U.S. at 180.  "The so-called 'qui tam' provision in § 3730(b) authorizes private individuals to sue on behalf of the government in order to aid in ferreting out abuses . . . ."[6]  *Sanderson*, 447 F.3d at 876.  However, "[t]he False Claims Act is not 'an all-purpose antifraud statute,' or a vehicle for punishing

---

[6] A False Claims Act action brought by a private person "shall be brought in the name of the Government."  31 U.S.C. § 3730(b).  "The Government may elect to intervene and proceed with the action . . . after it receives both the complaint and the material evidence and information."  31 U.S.C. § 3730(b)(2)-(5).  The Government declined to intervene in this case.  (ECF Doc. 10.)

garden-variety breaches of contract or regulatory violations." *Escobar*, 579 U.S. at 194 (internal

citation omitted).

### 2.    FCA's Pleading Requirements

The following must be sufficiently plead to state a claim for relief under the FCA:

> (1) that the defendant made a false statement or created a false record (2) with
> actual knowledge, deliberate ignorance, or reckless disregard of the truth or falsity
> of the information; (3) that the defendant submitted a claim for payment to the
> federal government; and (4) that the false statement or record was material to the
> Government's decision to make the payment sought in the defendant's claim.

*United States ex rel. Sheldon v. Kettering Health Network*, 816 F.3d 399, 408 (6th Cir. 2016)

(quoting *U.S. ex rel. SNAPP, Inc. v. Ford Motor Co.,* 618 F.3d 505, 509 (6th Cir. 2010)

(alterations in original omitted)); *see also United States v. Wal-Mart Stores East LP,* 858 F.

App'x 876, 878 (6th Cir. 2021) (setting forth the elements of a false claims act claim) and *United*

*States ex. rel. Prather v. Brookdale Senior Living Cmtys., Inc.* 892 F.3d 822 (6th Cir. 2018)

(setting forth similar elements for a false claims act claim).  Thus, a party must plausibly allege

"that a false statement was made with the requisite scienter, materiality, and causation." *United*

*States ex rel. USN4U, LCC v. Wolf Creek Fed. Servs.* 34 F.4th 507, 513 (6th Cir. 2022).

### 3.    Additional Pleading Requirement Under Fed. R. Civ. P. 9(b)

In addition to the FCA requirements, a relator alleging claims under the FCA must satisfy

the heightened pleading standard in Federal Rule of Civil Procedure Rule 9(b) "because

defendants accused of defrauding the federal government have the same protections as

defendants sued for fraud in other contexts."  *Chesbrough v. VPA, P.C.,* 655 F.3d 461, 466 (6th

Cir. 2011) (internal quotations and citations omitted); *United States v. Walgreen Co.*, 846 F.3d

879, 880–81 (6th Cir. 2017).  The purpose of Rule 9(b) is "to alert defendants 'as to the

particulars of their alleged misconduct' so that they may respond."  *United States ex rel. Bledsoe*

*v. Cmty. Health Sys., Inc.,* 501 F.3d 493, 503 (6th Cir. 2007).  Rule 9(b)'s "heightened pleading standard is also designed to prevent 'fishing expeditions,' . . . to protect defendants' reputations from allegations of fraud, . . . and to narrow potentially wide-ranging discovery to relevant matters."  *Chesbrough,*, 655 F.3d at 466–67 (citing and quoting *Bledsoe*, 501 F.3d at 503, n. 11 and citing *United States ex rel. SNAPP, Inc. v. Ford Motor Company,* 532 F.3d 496, 504 (6th Cir. 2008) ("*SNAPP I* ")).  "[W]hen deciding a motion to dismiss under Rule 9(b) for failure to plead fraud with particularity, a court must also consider the policy favoring simplicity in pleading, codified in the 'short and plain statement of the claim' requirement of Federal Rule of Civil Procedure 8[]" because "'Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather, the two rules must be read in harmony.'" *Sanderson*, 447 F.3d at 876 (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679 (6th Cir. 1988).)  Nevertheless, "a district court need not accept claims that consist of no more than mere assertions and unsupported or unsupportable conclusions." *Sanderson*, 447 F.3d at 876.

To plead fraud with particularity under Rule 9(b), "the plaintiff must allege (1) 'the time, place, and content of the alleged misrepresentation,' (2) 'the fraudulent scheme,' (3) the defendant's fraudulent intent, and (4) the resulting injury."  *Chesbrough*, 655 F.3d at 467 (citing and quoting *Bledsoe*, 501 F.3d at 504); *see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").  Although Rule 9(b) requires a plaintiff to plead the circumstances of the alleged fraud with particularity, allegations of "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  *See* Fed. R. Civ. P. 9(b).

In cases where a relator in a FCA case alleges a fraudulent scheme that is "complex and far-reaching" the heightened pleading requirements of Rule 9(b) may be relaxed because

"pleading every instance of fraud would be extremely ungainly, if not impossible." *Bledsoe*, 501 F.3d at 509.  Under those circumstances, the plaintiff may allege a more generalized false or fraudulent scheme perpetrated by the defendant.  *Id*. at 510.  However, courts should construe "the concept of a false or fraudulent scheme . . . as narrowly as is necessary to protect the policies promoted by Rule 9(b)." *Id.*  Thus, "the examples that a relator provides will support more generalized allegations of fraud only to the extent that the relator's examples are *representative samples* of the broader class of claims." *Id.* (emphasis in original).  Accordingly, although a relator need not "identify *every* false claim submitted for payment, he must identify with specificity 'characteristic examples that are illustrative of the class of all claims covered by the fraudulent scheme.'"  *Chesbrough*, 655 F.3d at 470 (quoting *Bledsoe*, 501 F.3d at 511 (omitting internal quotation marks) (emphasis in original)).

**B.     Whether Relator Plausibly Alleged FCA Claims Under 31 U.S.C. §§ 3729(a)(1)(A) and/or (a)(1)(B) (Counts I and II)**

 "It is not the alleged underlying violation of the SCA that implicates the False Claims Act." *United States ex rel. Conteh v. IKON Off. Sols., Inc.*, 103 F. Supp. 3d 59, 65 (D.D.C. 2015).  As discussed above, a party stating a claim under the FCA must plausibly allege "that a false statement was made with the requisite scienter, materiality, and causation." *Wolf Creek Fed. Servs.* 34 F.4th at 513.

Respondent argues that Relator's action should be dismissed because he has not plausibly alleged the requisite elements of an FCA claim.  (ECF Doc. 55-1, pp. 10-20; ECF Doc. 58, pp. 7-13.)  Relator in response contends that he has plausibly alleged a FCA claim under one of two substantially similar theories of liability—implied false certification or fraudulent inducement.[7]

---

[7] Relator's Amended Complaint includes allegations regarding false certifications regarding its payment of minimum wage and fringe benefit as required under the SCA.  (ECF Doc. 51, p. 1, ¶ 1, p. 4, ¶¶ 22-23, p. 5, ¶¶ 25-26, p. 9, ¶ 47, p. 10, ¶ 48.)  However, Relator's Amended Complaint does not clearly identify the specific theory of FCA

(ECF Doc. 57, pp. 8-16.)  Under both theories, a party is required to show not only the falsity of the statements, but also scienter, materiality, and causation.

      **1.      Whether Relator Has Plausibly Alleged FCA Claims Under Implied False Certification Theory of Liability**

The Sixth Circuit adopted the "implied false certification" theory in *U.S. ex rel. Augustine v. Century Health Servs., Inc.*, agreeing with other courts who had "held that a false implied certification may constitute a false or fraudulent claim even if the claim was not expressly false when it was filed.  Instead, liability can attach if the claimant violates its continuing duty to comply with the regulations on which payment is conditioned."[8]  289 F.3d 409, 415 (6th Cir. 2002).

The Supreme Court considered the theory more recently in *Escobar*, where it confirmed that "implied false certification theory can, at least in some circumstances, provide a basis for liability" under the FCA, and found specifically that the implied false certification theory:

> can be a basis for liability, at least where two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.

*Id.* at 186, 190; *see also United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 892 F.3d 822, 826 (6th Cir. 2018) (explaining liability can attach under an implied certification theory "when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the

---

liability alleged.  (ECF Doc. 51, pp. 10-11, ¶¶ 49-60) (Counts I and II (generally reciting the FCA's statutory language).)  It is in the motion to dismiss briefing where Relator makes clear that he is seeking to establish FCA liability under an implied false certification theory or a fraudulent inducement theory.

[8] A party may also seek to establish the falsity of a statement through a theory of liability referred to as "false certification."  *United States ex rel. Sheldon*, 816 F.3d at 408.  Under this theory, the Sixth Circuit has held that "'when a claim for payment expressly states that it complies with a particular statute, regulation, or contractual term that is a prerequisite for payment, failure to actually comply' satisfies this element."  *Id.* (quoting *Chesbrough*, 655 F.3d at 467) (alterations removed from original).

defendant's non-compliance with a statutory, regulatory, or contractual requirement") (quoting *Escobar*, 136 S.Ct. at 1995).

i.     **Whether Relator Has Plausibly Alleged a False Claim for Payment**

As it relates to the first element—falsity—the parties argue over the holding in *Escobar*. Respondent argues that the two conditions outlined in *Escobar* must be met in order for a claim for payment to be deemed false under the implied certification theory, and therefore that "specific representations" are required to state a valid FCA claim under an implied false certification theory of liability.  (ECF Doc. 55-1, p. 12; ECF Doc. 58, pp. 7-8.)  Relator and the United States argue that the two conditions outlined in *Escobar* are not mandatory requirements, but that the Supreme Court "validated implied false certification theory as a way to prove falsity and confirmed that an implied false certification claim exists when the two conditions are present," without requiring those conditions to proceed under an implied false certification theory.  (ECF Doc. 56, p. 2 (observing that courts are split as to whether the two conditions described in *Escobar* are mandatory to state a FCA claim under an "implied false certification" theory); ECF Doc. 57, p. 9.)  Relator further argues that the "implied false certification" standard set forth in *U.S. ex rel. Augustine* is not outdated in light of *Escobar*, and therefore that a specific false representation need not be demonstrated.  (ECF Doc. 57, pp. 9-10.)

Even assuming arguendo that Relator has plausibly alleged falsity under its reading of *Escobar*'s holding as to the "implied false certification" theory of FCA liability, the Court finds for the reasons explained below that Relator has not plausibly alleged the independent elements of scienter or materiality.[9]  Accordingly, the Court need not resolve the parties' dispute as to

---

[9] Although causation is also a necessary element of a FCA claim, the Court need not address that element because it has already determined that Relator has not plausibly alleged scienter or materiality.

whether the two conditions in *Escobar* are the only way in which a party can establish FCA liability under an "implied false certification" theory.

### ii.      Whether Relator Has Plausibly Alleged Scienter

The FCA's "scienter requirement defines 'knowing' and 'knowingly' to mean that a person has 'actual knowledge of the information,' 'acts in deliberate ignorance of the truth or falsity of the information,' or 'acts in reckless disregard of the truth or falsity of the information.'"  *Escobar*, 579 U.S. at 182 (quoting 31 U.S.C. § 3729(b)(1)(A)); *see also U.S. ex rel. Augustine*, 289 F.3d at 415-16 (explaining that "when FCA liability is premised on an implied certification of compliance with a contract, the FCA nonetheless requires that the contractor knew, or recklessly disregarded a risk, that its implied certification of compliance was false").  Although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally" under Rule 9(b), *see* Fed. R. Civ. P. 9(b), a party faces a "high bar" when alleging scienter.  *Wal-Mart Stores East LP,* 858 F. App'x at 879.

The Supreme Court has described the scienter requirement as "rigorous," explaining that "concerns about fair notice and open-ended liability [under the FCA] 'can be effectively addressed through strict enforcement of the Act's materiality and scienter requirements.'"  *Escobar*, 579 U.S. at 192 (quoting *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1270 (D.C. Cir. 2010)).  In discussing strict enforcement of the scienter requirement, the Sixth Circuit emphasized that "the FCA is aimed at stopping fraud against the United States and does not create 'a vehicle to police technical compliance with' federal obligations."  *United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 437 (6th Cir. 2016) (quoting *United States ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 531 (6th Cir. 2012) and citing *Sci. Applications Int'l Corp.*, 626 F.3d at 1271)).

17

Here, the parties' scienter arguments focus on paragraphs 43 through 47 of the Amended

Complaint, in which Relator alleges:

> 43.  Upon information and belief, Respondent subjected employees throughout the county to the same practices as Relator Stahl and Scott Pryor in order to win federal contracts and illegally retain money that belonged to its employees.

> 44.  Payroll administrators like Tina Farmer in the PFS payroll department knew of SCA underpayment issues at Postal Fleet Services.  Relator Stahl and his coworkers reported concerns of underpayment to Farmer without resolution. Farmer's knowledge may be imputed to the organization.

> 45.  Moreover, upon information and belief, Farmer's supervisors – i.e., Respondent's officers and executives – knew of rampant SCA underpayments throughout the country and failed to rectify the practices resulting in those underpayments.

> 46.  For instance, in April 2019, Postal Fleet Services paid $329,057 in back wages and benefits to 53 Alabama- and Mississippi-based employees for SCA violations functionally identical to those alleged herein.

> 47.  PFS thus knowingly, or at least recklessly, violated its certifications that it would pay prevailing wage and fringe benefits to employees.  PFS knew or should have known that its recordkeeping and pay practices constituted conduct that violated the SCA and its [sic] rendered false its separate certifications to USPS to pay prevailing wage and fringe benefits.

(Am. Compl., p. 9, ¶¶ 43-47.)  The "practices" referenced in paragraph 43 included Respondent

paying Mr. Pryor for 95.57 hours of work in February 2019 when his time sheet showed he was

entitled to pay for 103.5 hours of work (*id.* at pp. 6-7, ¶¶ 33-35) and Respondent contributing

$736.07 toward Mr. Stahl's fringe benefits in February 2019 when he was entitled to $872.95 in

fringe benefits (*id.* at pp. 8-9, ¶¶ 40-41).

The alleged fraudulent certifications included the following:

- USPS Form 7445, which Respondent allegedly submitted to secure the renewal of its SCA-governed service contracts, and which allegedly contains language certifying that the party submitting the form will "pay all service employees no less than the minimum salary and fringe benefits equal to the amount shown on the attached Wage determination" (Am. Compl., p. 4, ¶ 22); and

18

- Payroll journals or check stubs Respondent was required to submit to USPS within 90 days of any mid-contract change in the prevailing wage rate (*id.* at p. 5, ¶ 24).

Relator alleges generally, without specific factual allegations in support, that Respondent "submitted, and continues to submit" the certifications "knowing at the time of submission that it has not paid its SCA-covered employees as required by the SCA, and further has no intent to pay its service employees under its certifications."  (*Id.* at p. 5, ¶ 25.)

Respondent argues that the factual allegations relevant to scienter are vague, conclusory, and based primarily on "information and belief," and that Relator therefore fails to "plead sufficient facts to support a plausible, rather than merely possible, inference that Postal Fleet knowingly or recklessly submitted false claims."  (ECF Doc. 55-1, pp. 14-16; ECF Doc. 58, pp. 9-10.)  Relator argues in response that the Amended Complaint alleges "enough circumstantial evidence to infer [Postal Fleet] acted with at least reckless disregard of its falsely certified compliance with the SCA" because it "alleges underpayment for [Relator] and Scott Pryor . . . combined with reports to a payroll administrator, and [Postal Fleet]'s settlement with [the] Government for the same unlawful behavior in Alabama and Mississippi. . . ."[10]  (ECF Doc. 57, p. 11 (citing ECF Doc. 51, pp. 6-9, ¶¶ 32-46).)

Focusing on the factual allegations in paragraph 44—that Relator and his coworkers reported concerns regarding underpayment to a payroll administrator—Respondent argues that those "conspicuously vague allegation[s]" are insufficient to plead scienter because Relator did

---

[10] Respondent also argues that the allegations made "upon information and belief," may only be considered in a fraud case such as this where "the 'facts constituting the fraud are not accessible'" to the relator and the relator can "'provide[] the grounds for his suspicions.'"  (ECF Doc. 55-1, p. 15 (quoting *Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1108 (7th Cir. 2014).)  Respondent argues that the *Grenadyor* standard was not met here, where Relator was given significant document production before filing the Amended Complaint and has not argued that the facts constituting the fraud were not accessible to him.  (*Id.*)  Relator does not address this argument in his opposition brief, except to state: "[w]hile [Respondent] complains of pleading 'upon information and belief,' [Respondent] does in fact affirm the truth of the allegations in Paragraph 46 regarding the DOL settlement."  (ECF Doc. 57, p. 11.)  Since Relator does not argue that his allegations "upon information and belief" are sufficient to meet the pleading requirements for scienter, the Court will not consider whether *Grenadyor* is applicable here.

not also plead facts to establish what concerns were raised, when they were raised, how the administrator responded, what was determined regarding the merits of the concerns, and why the reports to that administrator "would have alerted anyone to a widespread issue."  (ECF Doc. 55-1, pp. 15-16.)  Respondent argues that the allegations fail to "support[] a plausible inference that anyone at Postal Fleet knew of widespread SCA violations at any relevant time," and further do not "support[] the necessary inference that anyone at Postal Fleet *involved in obtaining payment from the USPS* had such knowledge and believed it meant that Postal Fleet was effectively submitting false claims to the United States."  (*Id*. at p. 16 (emphasis in original).)

As to the additional allegations in paragraph 46 regarding Respondent's payment of back wages and benefits to 53 employees in Alabama and Mississippi in April 2019 for "functionally identical" violations, Respondent argues that Relator "alleges no facts supporting a plausible inference that Postal Fleet was aware of SCA compliance issues before the settlement, which occurred just three months before this lawsuit was filed, nor that Postal Fleet was aware of wider spread problems that the DOL investigation failed to uncover."  (ECF Doc. 55-1, p. 16.)

The question before this Court is whether the above factual allegations are sufficient to plead under a "rigorous" scienter standard that Respondent: (1) had "actual knowledge" that it was committing SCA violations, and that those violations rendered its certifications to USPS—specifically, that Respondent would pay prevailing wage and fringe benefits—false; (2) was deliberately ignorant to those facts; or (3) acted "in reckless disregard" of the same.  *Escobar*, 579 U.S. at 182; 31 U.S.C. § 3729(b)(1)(A)).  The factual allegations identified in support are that: (1) Relator was underpaid for fringe benefits in February 2019 (Am. Compl, pp. 8-9, ¶¶ 40-41); (2) a coworker was underpaid for wages that same month (*id.* at pp. 6-7, ¶¶ 33-35); (3) Relator and coworkers reported "concerns" regarding underpayment to a payroll administrator

"without resolution" (*id.* at p. 9, ¶ 44); and (4) Respondent paid 53 out-of-state employees $329,047 in back wages and benefits for "functionally identical" SCA violations in April 2019 (*id.* at p. 9, ¶ 46).

Relator argues that these allegations provide "enough circumstantial evidence to infer [Respondent] acted with at least reckless disregard of its falsely certified compliance with the SCA." (ECF Doc. 57, p. 11.) Respondent argues to the contrary that "Relator is unable to point to any well-pleaded factual allegation showing, as Relator must, that Postal Fleet knowingly or recklessly submitted false claims to the government." (ECF Doc. 58, p. 9.)

Upon consideration of the factual allegations in the Amended Complaint, the Court finds that Relator has failed to allege sufficient facts to plausibly—not only possibly—infer that Respondent not only knew or acted in reckless disregard of the fact that Respondent was committing the alleged widespread SCA violations (Am. Compl., p. 9, ¶ 45), but also knew or acted in reckless disregard of the fact that the USPS forms, payroll journals, and/or check stubs Respondent was allegedly submitting to the USPS contained false certifications regarding those SCA violations (*id.* at p. 9, ¶ 47).

The Sixth Circuit in *Prather* found sufficient facts to support a reasonable inference, under the FCA scienter standard, that a defendant acted with reckless disregard of the truth of its compliance with a requirement for timely submission of a Medicare certificate of necessity where the relator had alleged that: (1) she and others employed to review claims were instructed "to review the claims only cursorily," "that they needed to release claims more quickly," and "not to review the content of much of the documentation"; (2) she and others raised concerns about compliance with the regulations, but "were told to ignore any problems," had their concerns "repeatedly dismissed," were told "there is such a push to get the claims through," and

were told multiple times that "[w]e can just argue in our favor if we get audited"; and (3) the defendants sent an email acknowledging that not all physicians would be "comfortable" with signing untimely certifications and could not be "force[d]" to sign, which the court found suggested "the defendants knew that their conduct was, at least, perilously close to noncompliance."  *See* 892 F.3d at 837-38.

More recently, the Sixth Circuit found scienter was sufficiently pled at the motion to dismiss stage where the pleadings described recorded conversations among employees that suggested their "knowledge of . . . falsely inflated cost estimates and labor hours."  *Wolf Creek Fed. Servs., Inc.*, 34 F.4th at 516.

Here, in contrast, the factual allegations describe two SCA violations in February 2019 and a non-specific allegation that Relator and other employees raised "concerns" regarding underpayment with a single payroll administrator at unspecified times "without resolution." (Am. Compl., pp. 6-9, ¶¶ 33-35, 40-41, 44.)  Even though Relator was one of the people who allegedly reported concerns to the administrator, he does not state the specific underpayment concerns that were expressed, when they were expressed, how the payroll administrator responded to the reported concerns, whether the administrator reported those concerns to her supervisors or managers, or what, if any, responses the administrator received or conveyed from her supervisors or other management representatives regarding those concerns.

Further, while Relator alleges that the payroll administrator's knowledge regarding the concerns "may be imputed to the organization," (Am. Compl., p. 9, ¶ 43), he does not supply any specific factual allegations from which this Court could plausibly infer a nexus between the payroll administrator who knew of the concerns and any individual, department, or division in the organization that was responsible for submitting the alleged false certifications to the USPS.

The allegation that Respondent reached a settlement with 53 employees in Alabama and Mississippi in April 2019 regarding "functionally identical" SCA violations (*id.* at p. 9, ¶ 46) does not cure this failing, as there remain no factual allegations from which the Court could plausibly infer that the individual, department, or division responsible for submitting the alleged false certifications to the USPS knew of that out-of-state settlement or should plausibly have concluded based on that settlement that similar violations were occurring in Ohio.

For the reasons set forth above, the Court finds that Relator has failed to allege sufficient facts in the Amended Complaint to plausibly—not only possibly—create an inference that Postal Fleet knowingly or recklessly submitted false claims to the government.  Thus, Relator has failed to adequately plead scienter for his FCA claims under an "implied certification" theory.

### iii.    Whether Relator Has Plausibly Alleged Materiality

Although the failure to adequately plead scienter is sufficient to support a finding that Relator has failed to state a claim under an "implied certification" theory, the Court will next turn to consideration of whether Relator has adequately plead the factor of "materiality."

The Supreme Court has made clear that the "materiality" inquiry is not "too fact intensive for courts to dismiss [FCA] cases on a motion to dismiss . . . ."  *Escobar*, 579 U.S. at 195, n. 6.  "[T]he Act defines 'material' to mean 'having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'"  *Id.* at 182 (quoting 31 U.S.C. § 3729(b)(4)).  The *Escobar* Court explained that the "materiality standard is demanding," and clarified how the FCA's materiality requirement should be enforced.  *Escobar*, 579 U.S. at 192–94; *see also Prather*, 892 F.3d at 831 (recognizing *Escobar*'s clarification of the "materiality requirement" and its demanding standard).

Specifically, the Court explained that the pertinent inquiry is "not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Escobar*, 579 U.S. at 181.  Thus, the Court explained: "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment."  *Id*. at 194 (internal citations omitted).  "Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance."  *Id.*  Further, "[m]ateriality . . . cannot be found where noncompliance is minor or insubstantial."  *Id.*  The Court explained:

> In sum, when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement.  Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material.  Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 194–95.

Applying *Escobar*, the Sixth Circuit has focused its materiality analysis on the following factors: (1) whether the government expressly identified the relevant provision as a condition of payment; (2) whether the government refused to pay claims based on noncompliance with the provision, or conversely paid claims consistently despite actual knowledge of noncompliance and with no indication that its practices would change; and (3) whether the noncompliance was "minor or insubstantial" or went "'to the very essence of the bargain.'"  *Prather*, 892 F.3d at 831 (quoting *Escobar*, 579 U.S. at 193-95 & n. 5).  The court explained that *Escobar* did not

establish an exclusive list of considerations and that no one factor is dispositive, *id.* (citing *Escobar*, 579 U.S. at 190–96), and described the materiality analysis as "'holistic,'" *id.* (quoting *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 109 (1st Cir. 2016)).

Here, Respondent asserts that Relator has not plausibly alleged materiality because the factual allegations do not "support[] a plausible inference that the USPS would have withheld payment for services that Postal Fleet undeniably rendered in light of the alleged SCA compliance issues." (ECF Doc. 55-1, p. 17.) Instead, Respondent argues the allegation that its alleged "'false certifications have the natural tendency to influence the Government's decision . . . to pay [Postal Fleet] under those contracts'" merely paraphrases the legal standard, making it insufficient to satisfy *Escobar's* "rigorous" and "demanding" materiality standard. (*Id.* at pp. 17-18 (quoting Am. Compl., p. 10, ¶ 48).) Relator argues in response that he has plausibly alleged materiality, and highlights the Supreme Court's finding in *Escobar* that "[n]o one factor is 'automatically dispositive'" when assessing materiality. (ECF Doc. 57, pp. 12-14.)

In keeping with recent Supreme Court and Sixth Circuit precedent, this Court will focus its analysis on the *Escobar* materiality factors. But the Court will also briefly address the pre-*Escobar* cases cited in Relator's brief. First, Relator's citation to *Varljen v. Cleveland Gear Co., Inc.*, 250 F.3d 426, 430 (6th Cir. 2001), for the proposition that parties who contract with the government are held to the letter of their contract (ECF Doc. 57, p. 12) is inapt. *Varljen* did not address a materiality analysis and preceded *Escobar's* holding that "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." 579 U.S. at 194 (internal citations omitted). Relator's additional citations to out-of-circuit cases that preceded *Escobar's* clarification of the materiality standard are also not on point. For example, *U.S. ex*

*rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 200 (D.D.C. 2011), cited for the proposition that relators need not point to express contractual language to establish that SCA compliance was material, is of limited value given that Relator contends he "has pointed to express contractual language requiring compliance with the FCA." (ECF Doc. 57, p. 13.)  Finally, *U.S. ex rel. Sutton v. Double Day Office Services, Inc.*, 121 F.3d 531, 533–34 (9th Cir.1997), cited for the proposition that a false certification of compliance creates liability when the certification is a prerequisite to obtain a government benefit (ECF Doc. 57, pp. 13-14), is irrelevant since the *Sutton* court addressed whether the SCA preempted FCA claims such as those asserted in this case, finding that it did not.  *Sutton*, 121 F.3d at 533-35.  No such argument is made here.

The Court therefore turns to the factors identified in *Escobar* as relevant to materiality.

### a.  Whether SCA Provision Was an Express Condition of Payment

The first *Escobar* factor calls for consideration of whether the government "expressly identif[ied] [the relevant] provision as a condition of payment."  *Escobar*, 579 U.S. at 194.  Here, Relator does not make any factual allegation—or identify any specific contractual language—to indicate that the government expressly identified the SCA language in USPS Form 7445, or any similar certification, as a "condition of payment" for Postal Fleet's performance under its service contracts with the USPS.  Instead, Relator argues without specificity that he "has pointed to express contractual language requiring compliance with the FCA" and that Postal Fleet's "certifications of compliance with the SCA have the natural tendency to influence the Government's decision to award contracts and pay" Postal Fleet.  (ECF Doc. 57, pp. 12-13). These arguments and general allegations are not sufficient to meet the first *Escobar* factor.

Even if Relator had adequately alleged that the government expressly identified SCA certification language as a condition of payment under the service contracts, the *Escobar* Court

explained that "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment," and indeed that it is not "sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance." *Escobar*, 579 U.S. at 194; *see also id.* at 195 (rejecting proposition that "any statutory, regulatory, or contractual violation is material so long as the defendant knows the Government would be entitled to refuse payment were it aware of the violation"). The Court therefore turns to consideration of the remaining *Escobar* factors.

### b. Past Government Response to Known Noncompliance

The second *Escobar* factor relates to the government's past conduct in paying or not paying claims after learning of noncompliance with its requirements. *Escobar*, 579 U.S. at 194–95. In other words, did the government "'consistently refuse[] to pay claims in the mine run of cases based on noncompliance with the particular . . . requirement[]'" or, conversely, did it "consistently pay[] such claims" with "actual knowledge of the non-compliance" and "no indication that its practice will change." *Prather*, 892 F.3d at 831 (quoting *Escobar*).

Respondent argues that this factor suggests the SCA language was not material to payment under the service contracts because "Relator does not (and cannot) allege that Postal Fleet's April 2019 agreement to pay back wages and benefits under the SCA affected the USPS's decision to pay Postal Fleet for its services." (ECF Doc. 55-1, p. 18.) In so arguing, Respondent highlights the Sixth Circuit's holding in *Wal-Mart Stores East, LP*, that the "government's decision to pay . . . claims despite . . . knowledge is very strong evidence that those requirements are not material." (*Id.* (quoting *Wal-Mart Stores East, LP*, 858 F. App'x. at 879).) Relator argues in response that the DOJ settlement with Postal Fleet relating to employees in other states

does not demonstrate that "the Government had 'actual knowledge' that PFS was failing to pay prevailing wage or fringe benefits under the SCA *in Ohio*."  (*Id*. at p. 14 (emphasis in original).)

The Court finds that this factor does not weigh in favor of a finding of materiality. Relator has not alleged any facts suggesting that the government withheld payment—routinely or otherwise—on service contracts when it became aware that the contract holder had falsely certified its compliance with the SCA.  There are not even facts alleged to suggest the government withheld payment on service contracts upon learning of a contract holder's SCA noncompliance.  Although Relator alleges that the government obtained a settlement for payment of back wages in connection with "functionally identical" SCA violations in other states (ECF Doc. 51, p. 9, ¶ 46), there is no further allegation that the government withheld payment under any service contracts in light of those SCA violations.

Relator is correct—however—that the allegations also do not prove the converse, that the government consistently paid under service contracts despite actual knowledge of false certifications (or SCA violations), with no indication that its practices would change.  Instead, Relator has provided no specific allegations, one way or the other, as to whether the government paid or refused to pay under its service contracts upon learning that a contract holder had falsely certified its SCA compliance.  "Without allegations regarding past government action taken in response to known noncompliance . . ., this factor provides no support for the conclusion that the [language concerning SCA compliance] [wa]s material" to the government's decision to pay Postal Fleet under its service contracts.  *Prather*, 892 F.3d at 834.

### c.  Whether Noncompliance was "Minor and Insubstantial" or "Went to the Very Essence of the Bargain"

The third *Escobar* factor is "whether the 'noncompliance is minor or insubstantial' or . . . goes 'to the very essence of the bargain.'"  *Prather*, 892 F.3d at 834 (citing *Escobar*, 579 U.S. at

193–94 & n. 5).  Respondent argues that the alleged noncompliance—a "handful of alleged violations, totaling approximately $300"—is "precisely the type of 'minor or insubstantial' noncompliance that cannot be material."  (ECF Doc. 55-1, p. 18 (citing *Escobar*, 579 U.S. at 193-94 & n.5).)  Further, Postal Fleet argues that its compliance with the SCA does not "go to the 'very essence of the bargain' for [it] to provide surface transportation services to the USPS." (*Id.*)  Relator argues in response that the SCA "noncompliance is not minor or insubstantial, for if it were, it is unlikely that the Government would have pursued [Postal Fleet] for alleged SCA violations in two other states ultimately forcing a settlement."  (ECF Doc. 57, p. 14.)

In applying this factor on remand from the Supreme Court, the First Circuit concluded that licensing and supervision requirements for the MassHealth regulatory program went "to the 'very essence of the bargain[]' of MassHealth's contractual relationships with various healthcare providers under the Medicaid program."  *Escobar*, 842 F.3d at 110 (quoting *Escobar*, 579 U.S. at 193 n.5).  The court explained that this was true because, "[a]t the core of the MassHealth regulations program . . . [wa]s the expectation that mental health services [we]re to be performed by licensed professionals, not charlatans."  *Id.* at 111.

In *Wolf Creek Fed. Servs., Inc.*, the Sixth Circuit found a relator had sufficiently pled the materiality of "inflated cost estimates" where the government had asked the relator for a cost estimate "[r]ather than conduct its own independent research into the cost of a potential project" and had always awarded projects to the relator "for the amount stated in [it]'s estimate."  34 F.4th at 516-17.  In that context, the court found the estimates would have influenced the government's decision to award the contract at the estimated prices and pay those contract amounts, further explaining that "gross overcharging for work not done [went] inherently 'to the very essence of the bargain'" for the cost estimates.  *Id.* at 517.

In *Prather*, the Sixth Circuit found a relator sufficiently pled that a timing requirement for Medicare physician certifications went to the "essence of the bargain" where the purpose of the timing requirement was to prevent fraud and where specific government guidance documents had emphasized the importance of the timing requirement.  892 F.3d at 834-37.

Here, Respondent argues that its compliance with SCA requirements does not "go the 'the very essence of the bargain'" with respect to the underlying contracts, which were "to provide surface transportation services to the USPS."  (ECF Doc. 55-1, p. 18.)  The Court agrees.

The FCA "makes illegal the submission of false or fraudulent claims to the federal government." *Sanderson,* 447 F.3d at 876.  Thus, FCA liability is predicated on the submission of a claim for payment to the federal government, with the additional requirements that there be a false statement made with actual knowledge, deliberate indifference, or reckless disregard for its truth or falsity which is *material* to the government's decision to pay that claim.  *Sheldon*, 816 F.3d at 408.  In *Escobar*, the claims sought payment for medical services and the false statements related to the respondent's eligibility and licensure to provide those medical services.  *See* 842 F.3d at 105.  In *USN4U, LLC*, the claims sought payment for work performed under a contract and the false statements were inflated cost estimates used to set the contract price.  *See* 34 F.4th at 516-17.  In *Prather*, the claims sought payment for medical services and the false statements related to compliance with a regulatory requirement for the timely submission of physician statements that were required for payment on those claims.  *See* 892 F.3d at 826-27.

Here, the relevant claim for payment relates to Postal Fleet's contract to provide ground transportation services with the Government.  (ECF Doc. 51, p. 2, ¶ 14.)  But the alleged false statements and noncompliance do not relate to Postal Fleet's compliance with the regulations governing ground transportation, nor do they relate to licensing requirements or certifications for

30

drivers employed by Postal Fleet to provide the contracted for ground transportation.  Instead, Relator alleges that Postal Fleet secured the renewal of the relevant contracts, in part, by submitting a standard form which includes a statement that the signatory "will pay all service employees no less than the minimum salary and fringe benefits" set forth on an attached wage determination—a statement that was allegedly false in light of SCA violations.  (*Id.*, p. 4, ¶ 22.) In these circumstances, the Court finds that Relator's allegations do not sufficiently demonstrate that Postal Fleet's SCA noncompliance goes to the very essence of the bargain set forth in Postal Fleet's contracts to supply ground transportation services for the USPS.

The Court is also not persuaded by Relator's argument that the alleged noncompliance in this case is not minor or insubstantial because the DOJ pursued Postal Fleet for alleged SCA noncompliance in two other states.  Relator's allegations of widespread noncompliance are largely based on "information and belief" (ECF Doc. 51, p. 9, ¶¶ 43, 45), notwithstanding Respondent's production of all "documents previously produced to the Government in response to the Government's Civil Investigative Demand in connection with this matter" (ECF Doc. 49; ECF Doc. 46, p. 2, ¶ 4).  Further, as noted above, the connection between the alleged false statements and the alleged claims for payment are too attenuated to be considered substantial.

Considering all the *Excobar* factors relevant to materiality, the Court concludes that Relator has not plausibly alleged materiality.  The well-pleaded allegations of the Amended Complaint fail to establish that: (1) the government expressly identified the alleged SCA compliance language as a condition of payment under the service contracts; (2) the government refused to pay under the service contracts due to SCA noncompliance; or (3) that Postal Fleet's SCA compliance went to the "very essence of the bargain" for the government to pay Postal Fleet for its transportation services under the service contracts.  Instead, the allegations in the

31

Amended Complaint suggest "garden-variety breaches of contract or regulatory violations" that do not warrant relief under the FCA.  *Escobar*, 579 U.S. at 194.

Because Relator has not plausibly alleged scienter or materiality, his FCA claims in Counts I and II premised on an "implied false certification" theory of liability must be dismissed for failure to state a claim under Rule 12(b)(6).

## C.     Whether Relator Has Plausibly Alleged FCA Claims Under a Fraudulent Inducement Theory of Liability

Courts have recognized that FCA liability can also be established under a fraudulent inducement theory.  *Wolf Creek Fed. Servs., Inc.*, 34 F.4th at 513.  Under this theory, "FCA liability can be based on a fraudulent premise that caused the United States to enter into a contract."  *Id.*  "Once fraudulent inducement is shown, the original fraud renders all subsequent claims for payment false and actionable under the FCA."  *United States v. BAE Sys. Tactical Vehicle Sys., LP*, No. 15-12225, 2016 U.S. Dist. LEXIS 29785, at *8 (E.D. Mich. Mar. 9, 2016). However, like a claim asserted under an "implied false certification" theory, a relator seeking to establish liability under a fraudulent inducement theory, "must allege that false statements were made with the requisite scienter, materiality, and causation."  *Wolf Creek Fed. Servs., Inc.*, 34 F.4th at 513; *BAE Sys. Tactical Vehicle Sys.*, 2016 U.S. Dist. LEXIS 29785, at *8.

Relator argues that it has alleged sufficient facts to support FCA liability under a fraudulent inducement theory because:

> the SCA is explicitly incorporated into the contracts [Postal Fleet] operated under, and again reiterated in each of [Postal Fleet]'s renewals.  The SCA is material to the contracts at hand, and [Postal Fleet]'s continued noncompliance with the SCA is evidence that PFS signed each contract and renewal knowing it was not in compliance with the SCA and knowing further that it would remain noncompliant.

(ECF Doc. 57, p. 15.)  But Respondent argues that that Relator has not alleged fraudulent inducement with particularity under Rule 9(b), and specifically has not alleged sufficient facts to

plausibly demonstrate: that Postal Fleet made false statements to induce the USPS to enter a contract; that Postal Fleet had the requisite scienter, i.e., a future intent to violate the SCA; or that Postal Fleet's future SCA compliance was material to the USPS's decision to enter the service contracts.  (ECF Doc. 55-1, pp. 19-20.)  The Court agrees.

Even under the more relaxed pleading standard for "complex and far-reaching" fraudulent schemes under Rule 9(b), Relator must still "identify with specificity 'characteristic examples that are illustrative of the class of all claims covered by the fraudulent scheme.'" *Chesbrough*, 655 F.3d at 470 (citations omitted).  Here, Relator has generally alleged that government contractors like Postal Fleet must certify that they will comply with the SCA "[t]o secure and renew" contracts governed by the SCA, pointing specifically to the USPS Form 7445 that must be submitted "to secure [contract] renewal," and alleges that Postal Fleet has submitted such certifications while knowing that it has not paid its employees as required by the SCA. (Am. Compl., pp. 4-5, ¶¶ 21-22, 25.)  Relator has not alleged with particularity "the time, place, [or] content" of the fraudulent misrepresentation(s) that allegedly *induced* the USPS to enter the service contracts with Postal Fleet.  *Chesbrough*, 655 F.3d at 467 (citations omitted).  Further, for the reasons discussed at length in sections III.B.1.ii. and III.B.1.iii., *supra*, the Court finds Relator has not set forth sufficient factual allegations to plausibly allege that Postal Fleet knew or acted in reckless disregard of the fact that its SCA certifications were false, or that any SCA certifications by Postal Fleet were material to the government's entry into the service contracts.

For the reasons set forth above, the Court concludes that Realtor has not pled fraud with sufficient particularity under Rule 9(b) and has not sufficiently plead materiality or scienter. Accordingly, Relator's FCA claims in Counts I and II premised on a fraudulent inducement theory of liability are dismissed for failure to state a claim under Rules 9(b) and 12(b)(6).

**D.      Whether Relator Plausibly Alleged FCA Conspiracy Claims Under 31 U.S.C. § 3729(a)(1)(C) (Counts I and II)**

Relator's conspiracy claim, alleging a violation of 31 U.S.C. § 3729(a)(1)(C) is asserted in connection with his two counts alleging violations of 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B). To establish an FCA conspiracy claim, a relator "ultimately must be able to show (1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by [the government] and (2) at least one act performed in furtherance of that agreement." *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008). Additionally, "[c]onspiracy under the FCA is derivative of the substantive claims of submitting a false claim to the government or creating a false record." *Wal-Mart Stores East, LP,* 858 F. App'x at 879 (citing 31 U.S.C. § 3729(a)(1)(C); *United States ex rel. Crockett v. Complete Fitness Rehab., Inc.*, 721 F. App'x 451, 459 (6th Cir. 2018)).

Since the Court has concluded that Relator has not plausibly alleged a FCA claim in Counts I and II, his derivative FCA conspiracy claims in Counts I and II are also dismissed.[11] *See Wal-Mart Stores East*, 858 F. App'x at 879 (finding that relator's conspiracy claim fell along with the substantive FCA claims).

**E.      Whether Relator Plausibly Alleged FCA Conversion Claims Under 31 U.S.C. § 3729(a)(1)(D) (Count III)**

In Count III, Relator alleges an FCA conversion claim under 31 U.S.C. § 3729(a)(1)(D). That provision provides FCA liability where an individual has "possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to

---

[11] Even if not subject to dismissal on the basis that the claims are derivative of substantive claims not plausibly alleged, the conspiracy claims would fail because Relator has not sufficiently alleged facts of a conspiracy or with whom Postal Fleet conspired. He argues only that "the circumstantial evidence suggests that Respondent's scheme was far reaching. Given the same conduct was investigated in two states other than Ohio, it is proven that the violations alleged here were not mere isolated instances involving just one person." (ECF Doc. 57, p. 17.)  These minimal conclusory allegations are insufficient to plausibly allege a conspiracy FCA claim even if the claims did not fail for the reason set forth herein.

be delivered, less than all of that money or property." *Id*.  Relator alleges in the Amended

Complaint that "Respondent failed to pay wages and benefits in violation of Federal law, as

described herein, and thus retained a portion of Government money it was not entitled to keep."

(ECF Doc. 51, p. 12, ¶ 64.)

Respondent argues that "Relator has failed to plead any facts suggesting that Postal Fleet

held property or money that belonged to the government, much less that it knowingly failed to

return such money or property." (ECF Doc. 55-1, p. 21.)  In response, Relator asserts that Postal

Fleet "is entrusted with funds intended to be paid to service employees per the SCA" and when

Postal Fleet "pays its employees less than all of what they are owed under the SCA, and retains

those funds for itself, it fails to deliver less than all of the money or property entrusted to it by

the Government" and "has converted the funds to its own use." (ECF Doc. 57, p. 21.)  Relator

attempts to liken the allegations in this case to the allegations in *U.S. ex rel. Holbrook v. Brink's

Co.*, 2:13-CV-873, 2015 WL 196424, at *18 (S.D. Ohio Jan. 15, 2015).  In that case, it was

alleged that the Defendants who were entrusted with storing coins for the Federal Reserve

swapped out pennies minted prior to 1982 with later minted pennies that had less copper to

deprive the Treasury of the rising value of older pennies with higher copper content.  *Id.* at *1.

Relator alleges that Postal Fleet "retained a portion of Government money it was not

entitled to keep" when it failed to pay wages and fringe in compliance with the SCA.  (ECF Doc.

51, p. 12, ¶ 64.)  He does not allege however that that money belonged to the government.

Indeed, it is alleged that the Postal Fleet did not properly pay or retained funds *owed to Postal

Fleet employees* as wages or fringe benefits under the SCA.  Given these allegations, the Court

finds Relator's reliance on *Holbrook* misplaced and that Relator has not sufficiently or plausibly

alleged that Postal Fleet improperly retained funds or other property belonging to the

35

Government.  Accordingly, Relator's conversion claim in Count III is dismissed for failure to state a claim under Rule 12(b)(6).

For the reasons explained herein, the Court GRANTS Respondent's Motion (ECF Docs. 55, 55-1) and dismisses Relator's Amended Complaint.[12]

## F.    Relator's Contingent Request for Leave to File Amended Complaint

Having granted Respondent's Motion to Dismiss, this Court must next consider Relator's contingent request for leave to amend.  (ECF Doc. 57, p. 21.)  The entirety of Relator's contingent request is as follows:

> Though Relator maintains that the Amended Complaint survives Respondent's motion, if the Court is inclined to grant Respondent's motion on the basis that more examples of widespread pay practices are necessary, Relator respectfully requests leave to file a second amended complaint under seal.

(*Id*.)  Respondent argues that the cursory request for leave to amend, "which does not attach a proposed amended pleading or even identify allegations that could be added, is not a proper motion for leave to amend" should be denied.  (ECF Doc. 58, pp. 19-20.)  Respondent also asserts that the Court should deny Relator's request for leave to amend because amendment would be futile and would prejudice Respondent.  (*Id*. at pp. 20-22.)

The Federal Rules of Civil Procedure provide that leave to amend should be freely given when justice requires.  Fed. R. Civ. P. 15(a)(2).  However, a court is not required to grant leave to amend where there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc." *Skatemore, Inc. v. Whitmer*, 40 F.4th 727, 737 (6th Cir.), *cert. denied,* 143 S. Ct. 527 (2022)

---

[12] Given this ruling, it is not necessary that the Court consider Respondent's alternative argument that the public disclosure bar precludes Relator's claim.  (*See* ECF Doc. 55-1, pp. 22-23.)

(quoting *Parchman v. SLM Corp.*, 896 F.3d 728, 736 (6th Cir. 2018) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)) (emphasis removed).

A party seeking to amend his complaint, "[n]ormally . . . should attach a copy of the amended complaint." *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 444 (6th Cir. 2014).  Further, the Sixth Circuit has explained that "a request for leave to amend, almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss is ... not a motion to amend." *Alexander v. Eagle Mfg. Co., LLC*, 714 F. App'x 504, 511 (6th Cir. 2017) (quoting *La. Sch.Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 486 (6th Cir. 2010), quoting *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 784 (6th Cir. 2000)) (brackets and quotations in original omitted); *see also Ayer v. Cmty. Mercy Health Partners*, No. 3:18-CV-00327, 2019 WL 1902520, at *5 (S.D. Ohio Apr. 29, 2019).

Here, Relator has not sought leave to amend through a formal motion supported by legal authority, nor has he provided this Court or Respondent with a proposed second amended complaint.  Instead, he has made a brief contingent request for leave to amend that lacks detail and supporting legal authority.  He takes this approach even though he filed the Amended Complaint *after* Respondent filed its first motion to dismiss and *after* Respondent produced to him all the documents it had previously produced to the Government as part of the Government's investigation into his claims.  Relator also does not explain why he did not already make the contemplated changes before filing the Amended Complaint.

Even if this Court were to characterize Relator's contingent request as a motion to amend and overlook both the delay inherent to the request and its lack of specificity as to the proposed amendments, even Relator's bare description of the proposed amendments reveals that amendment would be futile.  The Court's dismissal of the Amended Complaint is based

primarily on the lack of specific factual allegations establishing that: Postal Fleet knew or acted with reckless indifference to the falsity of the alleged SCA certifications; and the alleged certifications were material to the USPS's entry into, or payments under, its service contracts with Postal Fleet.  Relator seeks leave to amend to the extent that "the Court is inclined to grant Respondent's motion on the basis that more examples of widespread pay practices are necessary. . . ."  (ECF Doc. 57, p. 21.)  The Court does not dismiss the Amended Complaint due to the lack of more expansive allegations regarding underlying SCA violations, and therefore finds that leave to file second amended complaint for that purpose would be futile.  Such an amendment would not alter the Court's conclusion that Relator has failed to plausibly allege scienter and materiality and therefore has failed to plausibly allege FCA claims.

For the reasons set forth above, the Court denies Relator's contingent request for leave to file a second amended complaint.

### IV.    Conclusion

For the reasons set forth above, the Court **GRANTS** Respondent's Motion (ECF Docs. 55, 55-1), dismisses Relator's claims against Respondent, and **DENIES** Relator's request for leave to file a second amended complaint.


April 24, 2024



*/s/ Amanda M. Knapp*
AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE